UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN M. O'BEIRNE,

                Plaintiff,        Case No. 11-cv-12045
                                   Honorable Sean F. Cox
                                   Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 14]

Plaintiff Steven M. O'Beirne ("O'Beirne") brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [8, 14], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.     RECOMMENDATION**

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") assessment that O'Beirne is not disabled under the Act. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [14] be GRANTED, O'Beirne's Motion for Summary Judgment [8] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the Commissioner's decision be AFFIRMED.

II.    **REPORT**

A.    **Procedural History**

On February 2, 2009, O'Beirne filed an application for DIB, alleging disability beginning on May 2, 2008.  (Tr. 115-21).  The claim was denied initially on June 17, 2009.  (Tr. 50-54).  Thereafter, O'Beirne filed a timely request for an administrative hearing, which was held on February 3, 2010, before ALJ William Thompson, Jr.  (Tr. 27-47).  O'Beirne (represented by attorney Joseph Houle) testified at the hearing, as did vocational expert ("VE") Stephen B. Schmidt.  (Tr. 31-46).  On March 4, 2010, the ALJ found that O'Beirne was not disabled.  (Tr. 12-20).  On March 31, 2011, the Appeals Council denied review.  (Tr. 1-4).  O'Beirne filed for judicial review of the final decision on May 10, 2011 [1].

B.    **Background**

1.    *Disability Reports*

In a February 26, 2009 disability field office report, O'Beirne reported that his alleged onset date was May 2, 2008.  (Tr. 135).  The claims examiner noted that O'Beirne's "behavior over the phone was normal."  (Tr. 136).

In a function report dated March 14, 2009, O'Beirne reported that he lives in a house with his family.  (Tr. 150).  He indicated that he spends most of his time each day reading, preferably with his legs up to "prevent feelings of syncop[e],"[1] but also spends time doing housework.  (*Id.*).  He is able to take care of animals, prepare simple meals, and has no problems with personal care.  (Tr. 151-52).  He does not do certain types of house or yard work, such as snow removal and raking leaves, because "brisk activity" causes syncope.  (Tr. 153).  He does go outside when the weather is nice, either walking or in a car, but he tries not to go out alone in

---

[1] Syncope is a "loss of consciousness resulting from insufficient blood flow to the brain."  *See* www.merriam-webster.com/medlineplus/syncope

case he passes out.  (*Id.*).  He does not drive, because his doctor advised him not to do so for six

months following his last syncope event.  (*Id.*).  He has noticed a decline in his ability to handle

money since the onset of his conditions, saying that he is now forgetful and depressed.  (Tr. 153-

54).  He reads, plays with his animals, and plays computer games on a daily basis.  (Tr. 154).  He

does not go out often, but he reports no problems getting along with others.  (Tr. 155).

When asked to identify functions impacted by his condition, O'Beirne checked lifting,

squatting, bending, standing, walking, sitting, talking, stair climbing, memory, and

concentration.  (Tr. 155).  He further explained that the syncope is triggered by sitting, coughing,

and physical exertion, and that his depression medications affect his mind.  (*Id.*).  He claimed he

could walk about one block before needing to stop and rest for an hour.  (*Id.*).  His ability to pay

attention has declined, perhaps because of the medication, but he can follow written and spoken

instructions, and he gets along well with authority figures.  (Tr. 155-56).

In an undated disability report, O'Beirne indicated that his ability to work is limited by

coronary artery disease, neurocardiogenic syncope, depression, and panic attacks.  (Tr. 159).

When asked how these conditions limit his ability to work, O'Beirne stated:

> Passing out while in sitting position.  Directed not to drive from 6 months
> of last event.  Still passing out 3/4 times a week.  Muscle spasms,
> confusion, depression, panic attacks.  As a trained project engineer, I was
> required to both commute to sites all over North America working around
> heavy machinery, inspecting devices/structures in high elevations and
> performing engineering duties in a sitting position for long hours.  I
> ultimately have became [sic] unable to perform these functions.  I
> typically only have about 2 or 3 good hours per day that I can function.  I
> require a lot of sleep to feel well.  Chest pain is constant.  The medications
> given for the depression/panic attacks/muscle spasms/heart palpitations
> and blood pressure limit my ability to concentrate at an acceptable level
> for my career's requirements.

(*Id.*).  O'Beirne reported that these conditions first interfered with his ability to work in

December 2007, but that he continued to work (albeit fewer hours per week and with less travel)

until May 2, 2008.  (Tr. 159-60).  At that point, having exhausted his FMLA and disability leave, and still unable to perform the duties of his job, he was told by his employer that there was no work for him.  (Tr. 160).

O'Beirne completed high school and one year of college.  (Tr. 170).  He also received training on Primavera Systems Project Management Software in 1989.  (*Id.*).  Prior to stopping work, O'Beirne worked as a Senior Mechanical Project Engineer, earning $38.00 per hour.  (Tr. 161).  In that job, he developed engineering designs and otherwise provided general project supervision and onsite management.  (*Id.*).  He was required to sit five hours per day; walk, stand, and climb one hour per day; and write, type or handle small objects eight hours per day. (Tr. 161-62).  He was frequently required to lift less than ten pounds, and supervised between five and fifty people.  (Tr. 162).

O'Beirne reported being seen by several doctors regarding his medical conditions.  (Tr. 162-68).  He also reported taking Aspirin and Plavix (as blood thinners), Atenolol and Midodrine (to regulate his blood pressure and syncope), Clonazepam (for muscle spasms), Nitroglycerine (as needed for chest pain), Omeprazole (for stomach issues), Paxil (for depression and panic attacks), Simvistatin (to lower lipids), and a Vitamin D supplement.  (Tr. 168-69).  All of these medications have side effects, ranging from nausea to bruising to drowsiness to lightheadedness and difficulty concentrating.  (*Id.*).  He further reported that he has had the following medical tests:  blood tests, breathing tests, cardiac catheterizations, EEGs, EKGs, MRI/CT scans, treadmill (exercise) tests, and chest x-rays.  (Tr. 169-70).

In a third party function report dated March 13, 2009, O'Beirne's wife, Jennifer, reported that O'Beirne's inability to drive and travel out of state, along with the effects of his medications, render him unable to perform his job.  (Tr. 188).  She confirmed that O'Beirne spends most of

his days in bed, with his legs elevated, "to eliminate the feelings of syncope." (*Id.*). O'Beirne is unable to sleep for long stretches of time, unable to perform indoor and outdoor chores, and unable to socialize. (Tr. 189). He needs reminders to take his medicine. (Tr. 190). And, although O'Beirne loves to cook, he no longer prepares meals because it is difficult for him to stand for long periods of time. (*Id.*). She confirmed that O'Beirne cannot drive and does not go out of the house alone. (Tr. 191). Because of the stress and depression induced by his syncope, O'Beirne is no longer able to handle the family's finances. (Tr. 191-92). He does not socialize with others, but has no problems getting along with family, friends, or neighbors. (Tr. 192-93). He has become "withdrawn" and "fearful" and feels physically worse each day. (Tr. 193). O'Beirne's wife confirmed his difficulty lifting, bending, standing, walking, sitting, stair climbing, and with memory, completing tasks, and concentration, saying that any changes in movement affect his blood pressure, which makes him pass out. (*Id.*). In his wife's words:

> Steve was a very independent, business orientated, intelligent, strong man. These illnesses have taken his normal life from him and our family. . . . When the ability [to work] was taken from him because of the syncope, his life made a great change. I have witnessed these episodes and scheduled many appointments with specialists. Depression has now got the best of him. He is 39 years old. Can't travel which is in his job description, can't drive, tried in the beginning and had to pull over. He has tried to fight this, but the symptoms are not stopping.

(Tr. 195).

In an undated disability appeals report, O'Beirne reported that, beginning on approximately June 15, 2009, his syncope events increased to 5-6 events per week. (Tr. 200). In addition, on May 30, 2009, he was diagnosed with sleep apnea, requiring him to sleep with a full face mask at night. (*Id.*). Since the time of his last report, he had undergone a sleep study and was placed on a CPAP machine. (Tr. 201). He was continuing to take Aspirin and Plavix, Atenolol and Midodrine, Clonazepam, and a Vitamin D supplement. (Tr. 202). In addition, he

had added Alprazolam (for depression and anxiety), Fludrocortisone (for syncope), Paroxetine
(for depression and syncope), and Simudstatin (for lipids). (*Id.*). He reported that his conditions
caused him to be "very forgetful, can not drive, unexpected passing out, loss of energy,
depression." (Tr. 203). In conclusion, he indicated that syncope is now occurring more often as
a result of a sneeze or coughing. (Tr. 204).

　　　　　　　　　2.　　　*Plaintiff's Testimony*

At the February 3, 2010 hearing before the ALJ, O'Beirne testified that he graduated
from high school and took college classes for a few months. (Tr. 31-32). He worked full-time as
a mechanical engineer until October 28, 2008, when he went off work as a result of his
neurocardiogenic syncope. (Tr. 32-33, 35). Since that time, he has attempted to do some work
from home, but his syncope makes it difficult to sustain any employment. (Tr. 33). In his job as
a mechanical engineer, the amount of time he spent standing and walking varied by project;
some days, he was "continuously walking" and lifting up to 40 or 50 pounds. (*Id.*).

O'Beirne further testified that he is unable to work because of the frequency of his
syncope events. (Tr. 35). He testified that these events, which occur three or four times per
week, and last between 30 and 60 seconds, render him "completely wiped out afterwards," and
he needs a full night's sleep to recover. (*Id.*). O'Beirne testified that he believes the frequency
of these events render him a danger to himself and to others, and employers are unwilling to risk
the liability associated with hiring him. (Tr. 41).

On a typical day, O'Beirne does some light house work (starting the laundry, loading and
unloading the dishwasher), and he might try to do some exercise. (Tr. 36). On occasion, he goes
grocery shopping with his wife. (Tr. 40). On average, though, he spends six to seven hours a
day lying down in an effort to raise his blood pressure. (Tr. 36). On a good day, he can walk

100-200 yards before he has to stop because of lightheadedness, shortness of breath, and fatigue. (Tr. 38). He can only stand still for two to three minutes or sit for 10-15 minutes; after that, he needs to put his legs up in the air, or the blood pooling in his arms and legs triggers syncope. (Tr. 39). As a result, he can no longer drive. (*Id.*). O'Beirne testified that he can lift a gallon of milk and that he can bathe and dress without assistance. (Tr. 40).

O'Beirne testified that he sees Dr. Kurt Holland and Dr. Timothy Shinn at Michigan Heart regarding his syncope. (Tr. 37). He has tried several medications for blood pressure and for the autonomic nervous system, but they produce side effects, and his physicians are still adjusting prescriptions and doses. (Tr. 37, 42). At the time of the hearing, O'Beirne said that he was on the waiting list to see a specialist who is "one of the best." (Tr. 37-38, 41). With respect to his coronary artery disease, O'Beirne testified that he suffered two heart attacks, one in September 2004 and one in March 2008. (Tr. 38). As a result, he changed his eating habits, and he continues to take blood pressure and cholesterol medication. (*Id.*).

### 3. Medical Evidence

The record contains a substantial amount of medical documentation regarding O'Beirne's coronary artery disease, neurocardiogenic syncope, anxiety and depression. Relevant aspects of O'Beirne's medical history will be discussed in chronological order.

#### (a) 2004

O'Beirne suffered a heart attack on September 13, 2004 and had stents placed in his right coronary and left anterior descending arteries. (Tr. 355). On September 22, 2004, he was seen by Dr. E.N. Papasifakis at Midwest Cardiology Associates ("MCA") in follow-up, where his cardiac examination was normal. (Tr. 381-82). On October 13, 2004, he had a normal exercise stress echocardiogram. (Tr. 323). On October 19, 2004, he was seen again at MCA for a follow-

7

up visit, where he stated that he had "no cardiac symptoms."  (Tr. 380).

(b)     2005

On April 28, 2005, O'Beirne presented at MCA "without cardiac related symptoms." (Tr. 379).  No problems were noted, and he was advised to return in six months.  (*Id.*).  On August 1, 2005, O'Beirne was seen at MCA for complaints of increasing chest discomfort over the prior two months.  (Tr. 373).  Although his clinical examination was mostly "unremarkable," he was scheduled for an exercise stress test, the results of which were "entirely normal."  (Tr. 373-75).  The examining physician concluded that his symptoms most likely were not cardiac in etiology, and he was advised to return in six months.  (Tr. 375-76).  On November 7, 2005, O'Beirne returned for a "cardiovascular reevaluation."  (Tr. 371).  At that point, he stated that he was "running a couple of miles a day and his symptoms of chest discomfort have completely resolved."  (*Id.*).

(c)     2006

On March 13, 2006, O'Beirne was again seen at MCA with complaints of worsening chest pain.  (Tr. 369).  It was recommended that he obtain a stress echocardiogram.  (*Id.*). However, when O'Beirne returned to MCA on July 6, 2006, it was noted that he had not undergone this test.  (Tr. 366).  The examining physician noted that his "symptoms do not sound to be cardiac."  (Tr. 367).  On June 26, 2006, O'Beirne underwent an angiogram at Beaumont Hospital, which showed no abnormality.  (Tr. 389).  And, on July 17, 2006, he had a normal exercise stress test at MCA.  (Tr. 321).

(d)     2007

On August 13, 2007, O'Beirne went to Oakwood Hospital with chest pain and palpitations.  (Tr. 385).  All of his cardiac tests – including a chest x-ray, an EKG, and an

8

exercise stress test – came back normal.  (Tr. 317, 385).  At a visit with his cardiologist on September 12, 2007, it was noted that he had been experiencing chest pain since 2004, but that it had "not been considered cardiac," and that all of his cardiac testing had come back negative. (Tr. 361).

On September 19, 2007, O'Beirne went to the emergency room at St. Mary Mercy Hospital in Livonia ("St. Mary's") with complaints of chest pain.  (Tr. 594).  He had a normal EKG and chest x-ray but was transferred to Oakwood Hospital, where he underwent a left heart catheterization to rule out stenosis.  (Tr. 383-84, 764).  The results of this test showed no significant in-stent re-stenosis.  (Tr. 405).

On September 26, 2007, O'Beirne was seen at MCA for evaluation.  It was noted that his coronary artery disease was "stable."  (Tr. 359).  On October 8, 2007, O'Beirne returned to the Oakwood Hospital emergency room with complaints of chest pain.  (Tr. 428).  On November 15, 2007, Dr. Papasifakis examined O'Beirne, noting that although he was "chronically anxious," he was in "no acute distress" and had "no cardiovascular issues at this time."  (Tr. 357).  On November 24, 2007, O'Beirne went to the St. Mary's emergency room with chest pain.  (Tr. 758).  All of the objective tests administered came back negative, however.  (Tr. 759).

On November 26, 2007, O'Beirne saw his primary care physician, Dr. Talanki Viswanath, complaining of chest and abdominal pain.  (Tr. 787).  He had recently stopped one prescribed medication (Vytorin).  (*Id.*).  Although anti-depressant therapy was discussed, O'Beirne stated that he was not depressed and wanted to wait on this.  (Tr. 788).

On November 27, 2007, he was again seen in the St. Mary's emergency room, this time for heart palpitations and dizziness.  (Tr. 750).  All of his tests – including lab work, an ECG, a head CT, and a chest x-ray – were negative.  (Tr. 752-57).  He admitted that he had not been

taking his prescribed medications, saying that he thought they were contributing to his symptoms. (Tr. 750). Ultimately, because all of the objective tests came back negative, the physician concluded that his spells sounded anxiety-related, possibility with some element of hyperventilation. (Tr. 752).

On December 14, 2007, O'Beirne went to the emergency room at Beaumont with palpitations and tunnel vision. (Tr. 225). He had an exercise stress test and a chest x-ray performed, both of which were normal. (Tr. 225-26, 238).

On December 28, 2007, O'Beirne presented to the emergency room at St. Mary's with "very vague" symptoms, including chest pain. (Tr. 567-69, 737). He had a chest x-ray and a chest CT scan, both of which were normal. (Tr. 742, 744). He was placed on Lopressor and Cardizem for suspected cardiospasm and known coronary artery disease, but he refused to take both medications. (*Id.*). He indicated that he was supposed to be taking an anti-depressant, but that he had discontinued the medication after only one dose. (Tr. 582, 731). Indeed, he indicated that he had not taken any medications in 3-4 weeks. (Tr. 729). He refused antidepressants in the hospital, stating that he believed his problems were not related to depression, but he was advised to see a psychiatrist. (Tr. 729).

*(e)     2008*

On January 6, 2008, O'Beirne was seen in the emergency room at St. Mary's for abdominal pain and difficulty breathing. (Tr. 740). He had a normal ECG, blood test, chest x-ray, and chest CT scan. (Tr. 741). On January 8, 2008, O'Beirne saw Dr. Viswanath, complaining of "pleurisy" and feeling like he could not get enough air. (Tr. 779). Dr. Viswanath referred him to a cardiologist, a pulmonologist, and a psychiatrist. (*Id.*). On January 9, 2008, O'Beirne went to the emergency room at Beaumont, complaining of shortness of breath.

10

(Tr. 235-37). He had a normal chest x-ray and a normal abdominal ultrasound. (*Id.*).

On January 12, 2008, O'Beirne again went to the St. Mary's emergency room, this time with spasms in his neck and an inability to swallow. (Tr. 726). He denied any chest pain and adamantly refused a chest pain workup. (*Id.*). The emergency room physician likened O'Beirne's condition to hyperventilation and ultimately diagnosed him with throat pain. (Tr. 727). On March 20, 2008, O'Beirne underwent a heart catheterization at Beaumont Hospital, which showed "severe focal stenosis," and he had another stent placed. (Tr. 221-22).

On April 14, 2008, O'Beirne saw Dr. Thomas Sisson at the outpatient Pulmonary Clinic at the University of Michigan regarding his recurrent complaints of chest pain and dizziness. (Tr. 532-34). Dr. Sisson suspected that O'Beirne "may have some neurologic condition," so he scheduled him for a swallow study and a cardiopulmonary exercise test.[2] (*Id.*).

On May 12, 2008, O'Beirne called an ambulance for himself and was taken to the St. Mary's emergency room for chest pain and muscle spasms. (Tr. 574). He had a chest x-ray, which showed no significant abnormalities, and an EEG (which was normal). (Tr. 716, 722). No diagnosis was given, and he was advised to follow up with neurology. (Tr. 721). Later that same day, O'Beirne saw Dr. Punitha Vijayakumar, a neurologist, regarding his spasms. (Tr. 969-70). Dr. Vijayakumar noted that O'Beirne had been prescribed Xanax and Ativan, but he did not want to take these medications because he did not believe they were helping. (Tr. 969). O'Beirne was advised to have some vasculitis workup, an EEG, a swallow study, and MRIs (once he was sufficiently far removed from his cardiac catheterization). (Tr. 970). On May 13, 2008, O'Beirne had an electroencephalogram (EEG) to rule out seizures, the results of which

---

[2] When O'Beirne returned to see Dr. Sisson on August 26, 2008, Dr. Sisson noted that at the time of his initial presentation (in April), his pulmonary function was normal, and he had a normal chest x-ray. (Tr. 535).

were normal.  (Tr. 485).

On May 22, 2008, O'Beirne returned to see Dr. Vijayakumar regarding the body spasms he was experiencing.  He had had an MRI of his C-spine, which found no abnormal problem in the spinal cord, as well as an MRI of his brain, which "showed no significant abnormalities." (Tr. 499, 712-14).  On June 4, 2008, O'Beirne saw Dr. Vijayakumar again for a follow-up visit regarding continued body spasms.  (Tr. 492).  He had undergone a spinal tap that day to rule out "stiff man syndrome," but had then passed out three times, and his wife was concerned.  (*Id.*). On June 7, 2008, O'Beirne returned to the St. Mary's emergency room with a post-spinal tap headache.  (Tr. 570).  On June 24, 2008, he had a normal echocardiogram.  (Tr. 489).  On June 26, 2008, he had a negative stress EKG.  (Tr. 488).

On July 2, 2008, O'Beirne saw Dr. Timothy Shinn at Michigan Heart for symptoms of syncope, which he stated had begun after he had a stent re-implanted in March 2008.  (Tr. 513). Dr. Shinn noted that O'Beirne's syncope was unique in that it happened in many different positions, including when he was at rest and/or supine.  (*Id.*).  At Dr. Shinn's recommendation, O'Beirne underwent a "head-up tilt table test," which was positive and consistent with a vasodepressor syndrome.  (Tr. 523).  He also underwent an electrophysiology study, the results of which were normal.  (Tr. 512).  On July 9, 2008, Dr. Shinn advised O'Beirne that he could return to work.  (Tr. 601).  He was reminded, however, that Michigan state law prohibited him from driving until he had been syncope-free for six months.  (*Id.*).

On July 17, 2008, O'Beirne returned to Michigan Heart for follow up.  (Tr. 555).  It was noted that although Dr. Shinn had recommended that O'Beirne take midodrine, he "took it for three days and felt poorly with it" so he "discontinued it at this point in time."  (*Id.*).  The examining physician, Dr. Kurt Holland, "strongly urged Mr. O'Beirne to give the midodrine

another attempt." (*Id.*).

On July 24, 2008, O'Beirne saw Dr. Viswanath for complaints of heart disease and episodes of dizziness and passing out. (Tr. 774). Dr. Viswanath suggested that O'Beirne take Lexapro (which would help both the depression and the syncope), but O'Beirne was "not sure yet." (*Id.*).

On August 22, 2008, O'Beirne returned to Michigan Heart for an electrophysiology follow-up. (Tr. 553). O'Beirne reported that after resuming the midodrine, he had had no recurrences of syncope. (*Id.*). It was also noted, however, that "he has stopped multiple medications because they were making him feel poorly." (*Id.*).

On August 26, 2008, O'Beirne returned to see Dr. Sisson at the University of Michigan. (Tr. 535). Dr. Sisson noted that O'Beirne had been diagnosed with neurogenic syncope and was being treated with atenolol and midodrine, which "resulted in a significant improvement of his syncope," as well as his other symptoms of muscle spasm. (*Id.*). Overall, O'Beirne reported that he was "feeling much better." (*Id.*).

*(f)   2009*

On February 16, 2009, O'Beirne was again seen at St. Mary's with complaints of chest discomfort. (Tr. 549). O'Beirne reported that he was having syncope three times per week, and it was noted that he "seems complacent about this." (Tr. 550). He had unilaterally decreased his dose of Paxil and completely stopped taking the midodrine. (*Id.*). Between February 16 and 17, 2009, he had a stress thallium test (negative), a troponin I 3X test (negative), and a myocardial perfusion imaging scan (negative). (Tr. 685). A 30-day event monitor was recommended (to evaluate the syncope events). (Tr. 552).

On March 2, 2009, O'Beirne saw Dr. Viswanath with complaints of a rash on his face

and hands following his February hospital admission.  (Tr. 772).  He also complained of "occasional episodes of palpitation and diaphoresis" and said that he was thinking of seeking another opinion at the Cleveland Clinic because the objective tests had revealed no underlying medical problems.  (*Id.*).

On April 6, 2009, O'Beirne was seen at Michigan Heart for a six-month follow-up.  (Tr. 979).  He reported that his "last true syncopal episode was a couple of weeks ago."  (*Id.*).  He was switched from midodrine to Florinef, and "no further evaluation [was] recommended for his episodes of chest discomfort in the face of a negative stress test."  (Tr. 980).  In addition, a 30-day monitor was to be performed, although the attending physician specifically stated:  "I have a low suspicion for an arrhythmogenic etiology for his symptoms."  (*Id.*).

On April 30, 2009, O'Beirne went to the emergency room at St. Mary's with complaints of chest pain.  (Tr. 919).  Again, however, he had a negative chest x-ray, and the examination was otherwise unremarkable.  (Tr. 922).

On May 14, 2009, O'Beirne returned to see Dr. Holland at Michigan Heart, complaining of extreme fatigue and difficulty sleeping.  (Tr. 982).  He had been having some atypical chest pain, but a recent Cardiolite test showed no evidence for ischemia.  (*Id.*).  He reported that he had had one recent syncopal episode; however, he stated "that since increasing his Florinef . . . he is doing much better and has had no recurrent episodes."  (*Id.*).  Dr. Holland suggested a sleep study to determine if O'Beirne was suffering from sleep apnea.  (*Id.*).

On July 31, 2009, O'Beirne saw Dr. Vijayakumar for the first time in about a year.  (Tr. 978).  O'Beirne reported that he had "had maybe three [syncope] episodes recently."  (*Id.*).  Dr. Vijayakumar noted that, in the intervening period between visits, O'Beirne had had a sleep study, which showed that he suffered from sleep apnea, and he was then sleeping with a CPAP

14

machine.  (*Id.*).  After examining O'Beirne, Dr. Vijayakumar concluded that he suffered from obstructive sleep apnea and, possibly, acid reflux disease.  He was advised to take antacids and "have good sleep habits."  (*Id.*).

On September 2, 2009, O'Beirne again went to the St. Mary's emergency room with chest pain.  (Tr. 933).  His serial troponins were done, which were negative, ruling out an acute myocardial infarction.  (*Id.*).  At discharge, he was advised to "get counseling regarding his anxiety depression as he has multiple triggers for his neurocardiogenic syncope."  (Tr. 934).

On October 7, 2009, O'Beirne was again seen at Michigan Heart.  (Tr. 985).  At that time, he reported that while taking Florinef, he was still having syncopal episodes "3-4 times a week for about the last year and a half" and that "over the last 3 weeks, they have increased in frequency to about 7-10 times a week."  (*Id.*).  O'Beirne reported that "he has not been driving lately, although he has been driving in the last year and a half."  (*Id.*).  He had recently been asked to increase his Florinef, but he reduced it on his own instead because it was giving him a headache.  (*Id.*).  O'Beirne was advised to switch back to midodrine, to increase his daily water and dietary sodium intake, and to follow up with Dr. Blair Grub at the University of Toledo regarding the recurrent syncope.  (*Id.*).  At the time of the February 3, 2010 hearing, O'Beirne had not seen Dr. Grub.  (Tr. 37-38).

On December 10, 2009, O'Beirne saw Dr. Viswanath with complaints of dizziness.  (Tr. 945).  He indicated that he had discontinued two of his medications, Paxil and Zetia, because he did not believe the Paxil was helping his depression and he "had problems" with the Zetia.  (*Id.*).  Dr. Viswanath recommended several follow-up tests, including a lipid profile, chemistry profile, and ultrasound of O'Beirne's gallbladder.  (Tr. 946).  The record does not indicate whether O'Beirne underwent these tests.

15

> (g) *Residual Functional Capacity Assessments and Other Evaluations*

On May 11, 2009, a physical residual functional capacity ("RFC") assessment was conducted. (Tr. 873-80). Dr. Donald Kuiper, a state agency medical consultant, examined O'Beirne's medical records and concluded that he retained the ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for 6 hours in an 8-hour work day, and sit for 6 hours in an 8-hour workday. (Tr. 874). He further concluded that O'Beirne could occasionally climb ramps or stairs, kneel, crouch, and crawl and could frequently balance and stoop, but could never climb ladders, ropes or scaffolds, and had to avoid concentrated exposure to hazards (such as unprotected heights and large and dangerous moving machines). (Tr. 875, 877).[3]

On June 13, 2009, a mental RFC assessment was conducted by Dr. Valerie Domino. (Tr. 881-98). After examining O'Beirne's records, Dr. Domino concluded that he did not meet or medically equal the criteria for Listing 12.04 (affective disorders) or Listing 12.06 (anxiety related disorders). (Tr. 885). This was because he had only mild limitations in his activities of daily living, moderate limitations in maintaining social functioning and concentration, persistence or pace, and no episodes of decompensation. (Tr. 895). Dr. Domino further concluded that O'Beirne could do simple, repetitive tasks and could work casually with the general public, co-workers, and supervisors, although he might occasionally need extra breaks due to psychiatric symptoms. (Tr. 883).

On May 21, 2009, O'Beirne was examined by Dr. Leonard Lachover, a state agency examining psychiatrist, for purposes of a psychiatric evaluation. (Tr. 899-901). Dr. Lachover

---

[3] In contrast, on September 22, 2009, O'Beirne's family doctor, Dr. Viswanath, completed a Medical Source statement, in which he opined that O'Beirne could lift less than ten pounds, could stand/walk less than two hours per day, could sit less than six hours per day, and could never climb, balance, crouch, or crawl. (Tr. 941-43).

2:11-cv-12045-SFC-DRG   Doc # 16   Filed 07/06/12   Pg 17 of 29   Pg ID 1087

noted that O'Beirne was not seeing a psychiatrist (although he had seen a therapist on one hospital visit). (Tr. 899). O'Beirne stated that his depression had worsened when he had his second heart attack, and he began feeling "low-esteem, sadness, more anxiety, decreased self-esteem, with periodic crying spells." (*Id.*). Dr. Lachover noted that O'Beirne was "pleasant and cooperative," and that his speech was "goal oriented and goal directed." (Tr. 899-900). Dr. Lachover further noted that O'Beirne's Global Assessment of Functioning (GAF) score was 40, and opined that: "Because of his psychiatric symptomatology, he is prone to relapses. It would be anticipated that work would be a stress that could lead to deterioration in his current condition." (Tr. 900).

### 4.    *Vocational Expert's Testimony*

Steven B. Schmidt testified as an independent vocational expert ("VE"). (Tr. 42-46). The VE testified that O'Beirne's past relevant work as a mechanical engineering project manager was skilled in nature, and at a light level of exertion. (Tr. 43). O'Beirne's other past relevant work as a computer systems manager was skilled in nature, and at a sedentary level of exertion. (*Id.*). The ALJ asked the VE to imagine a claimant of O'Beirne's age, education, and work experience, who would be limited as follows:

> . . . this individual is capable of lifting 20 pounds occasionally and 10 pounds frequently. He's capable of standing and walking in combination for at least six hours in the workday and capable of sitting at least six hours in a workday. This individual should not be required to climb ladders, ropes, or scaffolding. Cannot work at heights, or around hazardous, or dangerous machinery. Mentally he would be limited to work involving simple instructions and having relatively restricted contact with the public and co-workers. Restricted contact with co-workers meaning he can work in the presence of others but should not be part of a (INAUDIBLE) team or property work process.

(Tr. 43). The VE testified that the hypothetical individual would be capable of working in light, unskilled jobs, such as packer (15,000 jobs in Michigan), assembly (4,600 jobs in Michigan), and

17

laundry worker (3,000 jobs in Michigan).  (Tr. 43-44).  He further testified that these jobs are low-stress and involve essentially repetitive, simple tasks.  (Tr. 45).  However, the VE also testified that, if the hypothetical individual were required by a medical condition to lie down for four to six hours during daylight hours, there are no jobs in the national economy that he could perform.  (Tr. 44).

### C.   Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331 (E.D. Mich. Dec. 6, 2011), *citing* 20

C.F.R. §§404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).   "The burden of proof is on the claimant throughout the first four steps . . . .   If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."   *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**D.    The ALJ's Findings**

Following the five-step sequential analysis, the ALJ found that O'Beirne is not disabled under the Act.  At Step One, the ALJ found that O'Beirne has not engaged in substantial gainful activity since May 2, 2008, his alleged onset date.  (Tr. 14).  At Step Two, the ALJ found that O'Beirne has the severe impairments of neurocardiogenic syncope, history of coronary artery disease, mood disorder, and anxiety disorder.  (*Id.*).

At Step Three, the ALJ found that none of O'Beirne's severe impairments meet or medically equal a listed impairment.  (Tr. 14-15).  Specifically, with respect to O'Beirne's mental impairments, the ALJ considered Listings 12.04 (for affective disorders) and 12.06 (for anxiety disorders) and found that O'Beirne's impairments, considered singly and in combination, did not meet or medically equal the criteria of either of these Listings.  (*Id.*).

The ALJ then assessed O'Beirne's residual functional capacity ("RFC"), considering the degree of limitation found in the mental function analysis, and concluded that O'Beirne is capable of performing light work, as defined in 20 C.F.R. §416.1567(b), except as follows:  he can lift and carry 20 pounds occasionally and 10 pounds frequently; he can sit, stand, and walk for a total of 6 hours in an 8-hour workday; he cannot climb ladders, ropes or scaffolding and cannot work around heights or moving machinery; he is limited to work involving simple instructions; he must have relatively restricted contact with the public; and he must have

restricted contact with coworkers in the sense that he cannot be part of a work team or cooperative work process.  (Tr. 16).  At Step Four, the ALJ determined that O'Beirne cannot do his past relevant work as a mechanical engineer or computer project manager, both of which were skilled in nature. (Tr. 18).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that O'Beirne is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 19).  As a result, the ALJ concluded that O'Beirne is not disabled under the Act.  (*Id.*).

###      E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d

at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.      Analysis

O'Beirne argues that, in concluding that he was capable of performing certain light, unskilled jobs, the ALJ failed to adequately assess the credibility of his subjective complaints. (Doc. #8 at 8-12). Specifically, O'Beirne alleges that in concluding that his complaints of disabling symptoms and limitations were not credible, the ALJ both mischaracterized the record evidence and "<u>failed to address the majority of over 750 pages of medical records.</u>" (Doc. #8 at 14) (emphasis in original). A review of the record and decision, however, shows that the ALJ committed no error warranting remand.

21

As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Secretary of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981)*, quoting Beavers v. Secretary of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978). This court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [O'Beirne's alleged symptoms] are reasonable and supported by substantial evidence in the record." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The ALJ is not required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record. *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). Rather, when a complaint of pain or other symptoms is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible. *Soc. Sec. Rul.* 96-7p, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

With respect to O'Beirne's allegations that his anxiety and depression render him disabled, substantial evidence supports the ALJ's conclusion that this is not the case. The ALJ did largely accept O'Beirne's allegations regarding his mental health, and he incorporated these limitations into his RFC findings by limiting O'Beirne to work involving simple instructions and restricted contact with the public and co-workers. (Tr. 16). As the ALJ correctly noted,

however, there is no indication that O'Beirne's anxiety and depression were disabling.  O'Beirne was not undergoing regular mental health treatment.[4]  (Tr. 16, *citing* Tr. 899).  Dr. Lachover, a consultative examiner, noted that O'Beirne was "pleasant and cooperative," and that his speech was "goal oriented and goal directed" and "quite logical."  (Tr. 900).  Moreover, the medical records indicate that O'Beirne repeatedly denied suffering from depression, and that he unilaterally ceased taking anti-depressants (against the advice of his physicians) on more than one occasion.  (Tr. 582, 729, 731, 774, 945, 969).  The ALJ's conclusion that O'Beirne was not disabled as a result of his mental health symptoms is reasonable and supported by substantial evidence.

With respect to O'Beirne's history of coronary artery disease, the medical evidence in the record supports the ALJ's conclusion that this condition does not preclude all work.  As the ALJ recognized, treatment notes consistently indicate that O'Beirne was in no acute distress during his examinations.  (Tr. 17; *see, e.g.,* Tr. 380 ("no cardiac symptoms"), 379 (presented "without cardiac related symptoms"), 371 ("symptoms of chest discomfort have completely resolved"), 359 (coronary artery disease was "stable")).  Moreover, between the time of his first heart attack (in September 2004) and the hearing before the ALJ (in early 2010), O'Beirne had numerous objective cardiac tests performed – including exercise stress tests, stress echocardiograms, angiograms, chest x-rays, chest CT scans, ECGs, EKGs, a stress thallium test, a troponin I 3X test, and a myocardial perfusion imaging scan – all of which were entirely normal.  (Tr. 225-26, 238, 317, 321, 323, 373-75, 385, 389, 685, 716, 722, 742, 744, 752-59, 922).  O'Beirne concedes that although he underwent numerous medical tests, "many of these tests [were] negative."

---

[4] This is a relevant factor to be considered by the ALJ.  *See, e.g., Hale v. Sec'y of Health & Human Servs.*, 816 F.2d 1078, 1082 (6th Cir. 1987) (failure to seek treatment may be a factor to be considered against a claimant); *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997) (failure to seek mental health treatment weighed against allegations of mental disability).

(Doc. #8 at 8).  Lastly, as the ALJ noted, O'Beirne worked after both of his heart attacks – in September 2004 and March 2008 – and he does not allege that his coronary artery disease worsened after that period of time, which suggests that this condition would not currently prevent him from working.  (Tr. 17).

As for O'Beirne's neurocardiogenic syncope, it is this condition that he claims most prevents him from working.  (Tr. 35).  As the ALJ noted in his opinion, however, the medical evidence contained in the record simply does not support O'Beirne's allegation that this condition renders him completely disabled.  The ALJ noted that O'Beirne's treatment for this condition has been "essentially routine and conservative in nature."[5]  (Tr. 17).  Although O'Beirne had a positive tilt table test in July of 2008, which resulted in a diagnosis of vasodepressor syndrome (Tr. 512), following that diagnosis his syncope has simply been treated with various medications.  He has not been forced to undergo any radical surgeries or procedures; rather, he has simply tried different prescription medications, at different dosages, in an attempt to reduce the number of syncope episodes he has.  It was appropriate for the ALJ to consider the largely routine and conservative nature of O'Beirne's treatment in assessing his credibility.  *See Jennings v. Comm'r of Soc. Sec.*, 2011 WL 7025815 (E.D. Mich. Oct. 31, 2011) (ALJ properly considered conservative nature of claimant's treatment in discrediting his testimony regarding the intensity, persistence and limiting effects of his pain).

Moreover, there is substantial evidence in the record supporting the ALJ's conclusion

---

[5] In his brief, O'Beirne argues that "the fact that [he] was admitted to the hospital or visited the emergency room 17 times, sought the help of multiple specialists and underwent extensive testing derails the ALJ's reasoning that [his] treatment has been 'essentially routine and conservative' and that he was not completely compliant with treatment."  (Doc. #8 at 15).  As discussed above, however, the fact that O'Beirne repeatedly visited various emergency rooms and underwent diagnostic tests – the vast majority of which were completely normal – does not undercut the ALJ's conclusion.

that O'Beirne has not been entirely compliant in taking prescribed medications.  (Tr. 17).  For example, at November and December 2007 emergency room visits, O'Beirne admitted that he had not been taking his prescribed medications.  (Tr. 729, 750).  In May of 2008, O'Beirne's neurologist, Dr. Vijayakumar, noted that O'Beirne had been prescribed Xanax and Ativan, but he did not want to take these because he did not believe they helped.  (Tr. 969).  In June of 2008, Dr. Viswanath "re-suggested" that O'Beirne take a beta-blocker, but he "refused."  (Tr. 776).  On July 17, 2008, O'Beirne told Dr. Shinn at Michigan Heart that although he had been prescribed midodrine for his syncope, he "took it for three days and felt poorly with it," so he discontinued it.  (Tr. 555).  After re-starting on that medication, O'Beirne again stopped, even though it appeared to be working well for him.  (Tr. 535, 553); *supra* at 13.  And, as the ALJ noted, Dr. Viswanath[6] suggested in July of 2008 that O'Beirne take Lexapro, which would help his depression and his syncope, but O'Beirne indicated that he was "not sure yet."  (Tr. 774).  The fact that O'Beirne unilaterally discontinued prescribed medications, refused to take some suggested medications, and/or took lesser doses than prescribed certainly "suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application."  (Tr. 17).  *See Lemle v. Comm'r of Soc. Sec.*, 2012 WL 1060111 (E.D. Mich. Jan. 27, 2012) (failure to follow prescribed treatment is evidence supporting ALJ's determination that claimant's testimony was not entirely credible).

Additionally, the medical evidence in the record strongly suggests that O'Beirne's allegations regarding the limiting effects of his syncope are not fully credible.  Neurologic

---

[6] It appears that the ALJ confused Dr. Viswanath (O'Beirne's primary care physician) and Dr. Vijayakumar (his neurologist) in a few instances.  The ALJ's misstatements in this respect are immaterial, however, as he correctly analyzed the substantive issues.

testing done by Dr. Vijayakumar in 2008 was negative for any neurologic etiology.[7]  (Tr. 985).

Moreover, contrary to O'Beirne's allegations of recurrent fainting episodes, there is evidence in

the record that O'Beirne's syncope is not as debilitating as he claims.  For example, on August

22, 2008, O'Beirne reported that after resuming midodrine, he had had no recurrences of

syncope.  (Tr. 553).  Four days later, Dr. Sisson noted that the prescription medications O'Beirne

was taking had "resulted in a significant improvement of his syncope."  (Tr. 535).  And, as the

ALJ noted, at a visit to Michigan Heart in May of 2009, O'Beirne reported that he had only had

"one recent syncopal episode" and that he was "doing much better and has had no recurrent

episodes."  (Tr. 17, *citing* Tr. 982).

In addition, as the ALJ noted, O'Beirne's reported daily activities are not consistent with

the degree of limitation he alleges.  (Tr. 17).  He cares for animals at home, takes care of his

personal hygiene, rides in a car[8], spends time on the computer, reads, does housework, and

prepares simple meals.  (Tr. 150-54).  SSR 96-7p specifically lists daily activities as a factor to

consider when assessing credibility.

In other words, then, the ALJ recognized the duty imposed upon him by the regulations

and, in addition to O'Beirne's own subjective complaints, he considered the objective medical

evidence, as well as O'Beirne's daily activities, during the relevant time period in assessing

O'Beirne's credibility.  For the reasons discussed above, the ALJ's credibility determination is

reasonable and supported by substantial evidence in the record.

---

[7] The ALJ was correct in considering this fact.  *See* SSR 96-7p ("A report of negative findings from the application of medically acceptable clinical and laboratory diagnostic techniques is one of the many factors that appropriately are to be considered in the overall assessment of credibility.").

[8] O'Beirne indicated on a March 14, 2009 function report that he did not drive because his doctor had advised him that he was not permitted to do so for six months following a syncope episode. (Tr. 153).  However, on a visit to Michigan Heart in October of 2009, O'Beirne reported that he had been driving for the past year and a half.  (Tr. 985)

O'Beirne also argues that the ALJ's supposed failure to address the majority of over 750 pages of medical records "in and of itself demonstrates the ALJ failed to make his credibility finding <u>based on a consideration of the entire case record</u>," as required by the law.  (Doc. #8 at 14) (emphasis in original).  O'Beirne further argues that the ALJ failed to address "any of this medical evidence," referring to his many emergency room visits, his treatment with several physicians, and the "dozens of objective tests" he underwent.  (*Id.*).  As noted by the commissioner in his brief, however, twelve of O'Beirne's seventeen emergency room visits/hospital admissions occurred prior to May of 2008 (the alleged onset date).  (Doc. #14 at 8).  More importantly, although the ALJ might not have specifically cited to certain treatment records or test results, it is clear that he did in fact consider the extensive medical evidence in the record.[9]  There is no requirement that the ALJ must expressly discuss every piece of record evidence.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. Appx. 521, 526 (6th Cir. 2006).

Finally, O'Beirne argues that the ALJ erred in giving "little weight" to Dr. Viswanath's September 22, 2009 physical medical source statement, which opined that O'Beirne had completely work preclusive limitations.  (Doc. #8 at 15).  O'Beirne also argues that the ALJ erred in rejecting Dr. Lachover's conclusion that he is "prone to relapses and that work would likely be a stress that could lead to deterioration in his current condition."[10]  (*Id.*).  These

_____

[9] For example, although the ALJ does not discuss in detail O'Beirne's positive tilt table test, he does cite to records that discuss the results of that test, so he clearly was aware of it in formulating his decision.  (Tr. 17, *citing* Tr. 985).  Similarly, the ALJ cites to treatment notes of Dr. Viswanath, as well as Dr. Papasifikis.  (Tr. 17, *citing* Tr. 774, 982, 985).

[10] O'Beirne also argues that the ALJ erred in failing to consider the fact that Dr. Lachover gave

arguments are without merit.

The ALJ gave "little weight" to Dr. Lachover's opinion because it was inconsistent with O'Beirne's mental health treatment history and his activities of daily living. (Tr. 18). Similarly, the ALJ gave "little weight" to Dr. Viswanath's opinion regarding O'Beirne's lifting and postural limitations, as well as his opinion that O'Beirne is "unable to return to work" because these opinions were "quite conclusory," because Dr. Viswanath provided very little explanation of the evidence relied on in reaching his conclusions, and because he stated an opinion on an issue reserved to the commissioner. (*Id.*). The ALJ's determinations in these respects are supported by substantial evidence. *See* 20 C.F.R. §404.1527(e)(1), (e)(3).

In evaluating the medical opinions of various physicians in this case, the ALJ thoroughly considered their bases, in light of the other evidence in the record. As a result, the ALJ gave Dr. Kuiper's opinion substantial weight because it was consistent with both the medical evidence and O'Beirne's activities of daily living. (Tr. 17). Similarly, the ALJ gave substantial weight to the opinion of Dr. Domino, the state agency psychological consultant, who stated that O'Beirne can do simple, repetitive tasks for 40 hours per week and work casually with the general public, coworkers and supervisors, finding that this opinion was consistent with O'Beirne's statements that he gets along well with authority figures and follows written and spoken instructions well. (Tr. 17).

In sum, the ALJ's evaluation of the various medical opinions and O'Beirne's credibility, as well as his conclusions regarding O'Beirne's RFC, are supported by substantial evidence and should not be disturbed.

---

him a GAF score of 40, indicating "serious and work preclusive limitations." (Doc. #8 at 11-12). There is no merit to this argument, however. *See White v. Comm'r of Soc. Sec.*, 2011 WL 5104622 (E.D. Mich. Oct. 27, 2011) (there is no statutory, regulatory, or other authority requiring the ALJ to "put stock" in a GAF score).

III.     CONCLUSION

For the foregoing reasons, the court RECOMMENDS that O'Beirne's Motion for Summary Judgment [8] be DENIED, the Commissioner's Motion for Summary Judgment [11] be GRANTED, and this case be AFFIRMED.

Dated: July 6, 2012                           s/David R. Grand
Ann Arbor, Michigan                           DAVID R. GRAND
                                              United States Magistrate Judge


## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 6, 2012.

                                              s/Felicia M. Moses
                                              FELICIA M. MOSES
                                              Case Manager